UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHRISTOPHER D. SCHNORR,

        Petitioner,

                                      CASE NO. 05-CV-74644-DT
    v.                                JUDGE VICTORIA A. ROBERTS
                                      MAGISTRATE JUDGE PAUL J. KOMIVES

BLAINE LAFLER,

        Respondent.[1]

_____/


**REPORT AND RECOMMENDATION**


*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
     D.    *Identification Claim (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
          1.    *Factual Background Relating to the Identification* . . . . . . . . . . . . . . . . . . . . . . . . . 12
          2.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
          3.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     E.    *Confrontation Claim (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
          1.    *Violation of Res Gestae Statute and Failure to Instruct* . . . . . . . . . . . . . . . . . . . . . . 17
          2.    *Right to Confront the Witness* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
     F.    *Evidentiary Claim (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
     G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

_____

     [1]By Order entered this date, Blaine Lafler has been substituted for Kenneth McKee as the proper respondent in this action.

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.    REPORT:

A.    *Procedural History*

1.    Petitioner Christopher D. Schnorr is a state prisoner, currently confined at the Carson City Correctional Facility in Carson City, Michigan.

2.    On July 24, 2002, petitioner was convicted of armed robbery, MICH. COMP. LAWS § 750.529; conspiracy to commit armed robbery, MICH. COMP. LAWS § 750.157a; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Macomb County Circuit Court.  On August 23, 2002, he was sentenced as a fourth habitual offender to concurrent terms of 572-720 months' imprisonment on the robbery and conspiracy convictions, and to a mandatory consecutive term of two years' imprisonment on the felony firearm conviction.[2]

3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

> I.    DEFENDANT'S CONVICTION MUST BE SET ASIDE BECAUSE IT WAS BASED ON EYEWITNESS IDENTIFICATION AT TRIAL, FOLLOWING GROSSLY IMPROPER AND PREJUDICIAL CONDUCT OR PROCEDURES RELATED TO THE IDENTIFICATION WHICH WAS SO INNATELY TAINTED/IMPERMISSIBLY SUGGESTIVE AS TO GIVE RISE TO A SUBSTANTIAL (UNACCEPTABLE) LIKELIHOOD OF MISIDENTIFICATION. . . .

---

[2]Petitioner is also serving a sentence imposed as a result of separate armed robbery conviction arising from a different robbery. *See People v. Schnorr*, No. 242306, 2004 WL 928261 (Mich. Ct. App. Apr. 29, 2004).  That conviction is the subject of a separate habeas action, docketed as Case No. 05-CV-74641.

II.     THE TRIAL COURT REVERSIBLY ERRED, DENIED MR. SCHNORR HIS CONSTITUTIONAL RIGHT TO A PROPERLY INSTRUCTED JURY/JURY TRIAL, FUNDAMENTAL DUE PROCESS AND FAIR TRIAL BY REFUSING DEFENDANT'S REQUEST FOR THE COURT TO GIVE AN INSTRUCTION AS TO TAKING JUDICIAL NOTICE OF THE FOUR FACTORS OF PSYCHO/LEGAL FUNDAMENTALS OF CONCERN REGARDING EYEWITNESS IDENTIFICATION AS SET FORTH IN PEOPLE V. FRANKLIN ANDERSON AND NOTED BY OUR STATE SUPREME COURT AS BEING APPROPRIATE OR PROPER FOR OUR STATE COURTS TO TAKE JUDICIAL NOTICE OF SAME BASED ON THE UNITED STATES SUPREME COURT HAVING SPECIFICALLY RECOGNIZED EACH OF THE FACTORS. . . .

III.    THE PROSECUTOR'S FAILURE TO PRODUCE A RES GESTAE WITNESS IT LISTED (JOHN BROWN) AS ONE THAT THE GOVERNMENT INTENDED TO CALL AND ITS FAILURE TO INSTRUCT THE JURY PURSUANT TO THE STANDARD JURY INSTRUCTION CJI2d 5.12 THAT BECAUSE THE PROSECUTOR FAILED TO PRODUCE THIS RES GESTAE WITNESS IT COULD INFER THAT HIS TESTIMONY WOULD BE DETRIMENTAL TO THE PROSECUTION AND FAVORABLE TO THE DEFENSE WAS SO IMPROPERLY PREJUDICIAL TO DEFENDANT SCHNORR THAT HE WAS AS A RESULT DENIED HIS CONSTITUTIONAL RIGHT(S) TO CONFRONTATION, TO PRESENT A DEFENSE, TO A JURY TRIAL, TO FEDERAL DUE PROCESS AND A FAIR TRIAL.  FURTHER, THE RESULT HERE AS A MISCARRIAGE OF JUSTICE.

IV.     DEFENDANT WAS DENIED FUNDAMENTAL DUE PROCESS AND A FAIR TRIAL BY EACH INDIVIDUAL ERROR NOTED HEREIN AND/OR THE CUMULATIVE EFFECT OF SUCH ERRORS.

V.      BASED ON DEFENDANT'S CHALLENGE TO THE UNTIMELY/LAST MINUTE AMENDMENT TO THE HABITUAL OFFENDER ENHANCEMENT NOTICE (FOURTH) IN THIS CASE, IF DEFENDANT'S CONVICTION IS AFFIRMED THE MATTER MUST STILL BE REMANDED FOR A REDUCTION OF THE HABITUAL OFFENDER ENHANCEMENT NOTICE FROM FOURTH TO THIRD AND RESENTENCING.  TO DO OTHERWISE WOULD CONSTITUTE A DENIAL OF FUNDAMENTAL/CONSTITUTIONAL DUE PROCESS AND RESULT IN A MISCARRIAGE OF JUSTICE.

VI.     DEFENDANT'S SENTENCE MUST BE CORRECTED BY THIS COURT BECAUSE IT VIOLATES THE TWO-THIRDS RULE OF PEOPLE V. TANNER NOW MADE PART OF THE STATUTORY LAW AS PART OF

THE SENTENCING GUIDELINES LEGISLATION MCL 769.34(2)(b). DEFENDANT IS ENTITLED TO A CORRECTION OF THE MINIMUM SENTENCE HERE BY THIS COURT TO NOT EXCEED TWO-THIRDS OF THE MAXIMUM IMPOSED OF SIXTY (60) YEARS. HIS SENTENCE MUST BE CORRECTED TO A MINIMUM OF 40 YEARS TO A MAXIMUM SENTENCE OF 60 YEARS.

In addition, petitioner filed a *pro per* supplemental brief, raising a single claim:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR, ABUSED ITS DISCRETION AND DENIED DEFENDANT FUNDAMENTAL/FEDERAL DUE PROCESS AND A FAIR TRIAL WHEN IT ADMITTED EVIDENCE THAT CHRISTOPHER SCHNORR ALLEGEDLY HAD A SELF INFLICTED GUNSHOT WOUND ON HIS LEG PURSUANT TO MRE 402 WHICH PROVIDES THAT EVIDENCE WHICH IS NOT RELEVANT IS NOT ADMISSIBLE. MRE 403 AND 404(b) PROVIDE FOR THE EXCLUSION OF EVIDENCE WHOSE PROBATIVE VALUE IS OUTWEIGHED BY ITS PREJUDICIAL IMPACT. . . . ADDITIONALLY MRE 404(b) PROHIBITS THE USE OF EVIDENCE WHEN THE EVIDENCE IS BASED ON THE CHARACTER OF THE DEFENDANT AND WHICH ONLY SHOWS THE DEFENDANT'S CRIMINAL PROPENSITY TO COMMIT AN ACT.

The court of appeals agreed that the trial court had erred in setting petitioner's minimum sentence, and remanded with instructions that the trial court reduce the minimum terms on the robbery and conspiracy convictions to 480 months' imprisonment. In all other respects, the court of appeals found no merit to petitioner's claims and affirmed his conviction and sentence. The court did not address petitioner's *pro per* evidentiary issue. *See People v. Schnorr*, No. 244183, 2004 WL 895881 (Mich. Ct. App. Apr. 27, 2004) (per curiam).

4.       Petitioner, proceeding *pro se*, sought leave to appeal to the Michigan Supreme Court, raising his identification, res gestae witness, and evidentiary claims. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Schnorr*, 471 Mich. 921, 688 N.W.2d 830 (2004).

5.       Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on December 7, 2005.  As grounds for the writ of habeas corpus, he raises the three claims that he

raised in the Michigan Supreme Court, reformulated as follows:

    I.      PETITIONER'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED IN THAT [THE] TRIAL COURT PERMITTED AN IN-COURT IDENTIFICATION OF PETITIONER, FOLLOWING AN IMPERMISSIBLY SUGGESTIVE CORPOREAL LINE-UP, WHERE THE PROSECUTION FAILED TO MAKE A SHOWING THAT THE IN-COURT IDENTIFICATION HAD AN INDEPENDENT BASIS FREE FROM THE SUGGESTIVE LINE-UP.

    II.     PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT OF CONFRONTATION WHERE THE PROSECUTION FAILED TO PRODUCE RES GESTAE WITNESS JOHN BROWN, AND FURTHER FAILED TO SHOW A REASONABLE GOOD FAITH EFFORT TO PRODUCE SAID WITNESS PRIOR TO TRIAL.

          A.     THE TRIAL COURT'S DECISION NOT TO PROVIDE [A] MISSING WITNESS JURY INSTRUCTION WAS CLEAR ERROR WHICH VIOLATED PETITIONER'S [sic] DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.

    III.    PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT WHERE THE TRIAL COURT ABUSED IT'S DISCRETION IN ALLOWING THE ADMISSION OF IMPERMISSIBLE EVIDENCE DURING TRIAL.

    6.      Respondent filed his answer on June 15, 2006.  He contends that petitioner's

confrontation claim is unexhausted, and that all of petitioner's claims are either without merit or not

cognizable on habeas review.

    7.      Petitioner filed a reply to respondent's answer on August 9, 2006.

B.    *Factual Background Underlying Petitioner's Conviction*

    Petitioner's conviction arises from the April 10, 2001, robbery of the Rivercrest Family

Dining restaurant.  The evidence adduced at trial was accurately summarized by the prosecution's

brief in opposition to petitioner's application for leave to appeal in the Michigan Supreme Court:

On April 10, 2001, a few minutes before 9:30 p.m., Mark Barnett ("Mr. Barnett"), the owner of River Crest Family Dining ("River Crest"), was in the back of his restaurant's kitchen repairing a microwave oven. (Tr. 7-17-02, 42-43). River Crest is located at 37531 Harper, just north of 16 Mile Road, in Clinton Township. (Tr. 7-17-02, 42). One of the restaurant's cooks, Konstantino Koutsimbas ("Mr. Koutsimbas"), worked near Mr. Barnett at a stove in the back of the kitchen. (Tr. 7-17-02, 44- 45, 71-72). Near 9:30 p.m., another cook, John Brown ("Mr. Brown"), walked out the back door of the restaurant to take "garbage or grease out to the dumpster." (Tr. 7-17-02, 43). Mr. Barnett received "deliveries and everything through that back door" and it was the restaurant's "main exit door." (Tr. 7-17-02, 43). As Mr. Brown came back into the restaurant through the back door, "two guys followed in directly behind him." (Tr. 7-17-02, 43; 72-74).

As Mr. Barnett worked on the microwave oven, he stood 10 to 15 feet from the back door. (Tr. 7-17-02, 44). Immediately upon entering the back door of the restaurant, one of these male individuals (Intruder #1) "pointed a gun at [Mr. Barnett's] head and told [him] to get on the floor." (Tr. 7-17-02, 43-44). Mr. Barnett got on the floor. (Tr. 7-17-02, 44). He demanded that Mr. Koutsimbas get down on the floor. (Tr. 7-17-02, 74-75). Mr. Koutsimbas "laid flat down on [his] face." (Tr. 7-17-02, 75). Intruder #1, with a black handgun, wore a red and blue horizontal-striped shirt, dark pants, and a light-colored baseball cap pulled down tight over his face. (Tr. 7-17-02, 45, 51, 78, 110, 121, 130). Both intruders were Caucasian. (Tr. 7-17-02, 72, 130). The intruders went to the front of the restaurant to gather the remaining employees (two dishwashers, a busboy, and two waitresses) and one of the customers. (Tr. 7-17-02, 45-46, 100-101, 109, 119-120, 128-135). Two customers in River Crest remained in the front of the restaurant. (Tr. 7-17-02, 97-107). As the robbery progressed, Intruder #1 made repeated threats to the River Crest employees about using his gun. (Tr. 7-17-02, 107, 112).

With all the restaurant's employees in the back of the restaurant, Intruder #1 "asked who's the manager" or "the money man." (Tr. 7-17- 02, 46; Tr. 7-17-02, 77-78, 110, 119-120). Mr. Barnett identified himself and Intruder #1 took him over to the cash register. (Tr. 7-17-02, 47; Tr. 7-17-02, 76). Mr. Barnett hit the "no sale" button and the cash register opened up, revealing money inside. (Tr. 7-17-02, 47). With his hands raised, Mr. Barnett stepped back from the cash register. (Tr. 7-17-02, 47). Intruder #1 stated: "[M]other fucker, I know there's more." (Tr. 7-17-02, 47). Upon hearing that, Mr. Barnett went to his office, opened the door, and "went down to open the safe." (Tr. 7-17-02, 47-48). Mr. Barnett opened the safe, which contained around $3,000.00, as Intruder #1 stood behind him in the doorway. (Tr. 7-17-02, 48-49). Mr. Barnett's "green bank bag" containing money sat on his desk. (Tr. 7-17-02, 50).

As Mr. Barnett got up, however, Intruder #1's "gun went off in the office." (Tr. 7-17-02, 48, 101, 110-111, 122, 131-132). Mr. Barnett could not see in which direction the gun was fired because his back was to Intruder #1. (Tr. 7-17-02, 48-49). The gun shot "really startled" Mr. Barnett and he "saw little pieces of . . . paper. . . floating down from the ceiling." (Tr. 7-17-02, 48). At this point, the intruders

"gathered up all the money and ran out the door." (Tr. 7-17-02, 49, 52). Mr. Barnett called his alarm company and told that he had been robbed. (Tr. 7-17- 02, 52-55). At the same time, one of the customers, Jill Hallock ("Ms. Hallock"), ran out the front door of the River Crest, went next door, and called 911. (Tr. 7-17-02, 99).

Just after 9:30 p.m., Officers Leo Delor ("Officer Delor") and Daniel Dohring ("Officer Dohring") from the Clinton Township Police Department ("CTPD") arrived at the restaurant. (Tr. 7-17-02, 56, 136-137, 144-145). The River Crest employees told the officers that "two guys had done a robbery and left off the back door." (Tr. 7-17-02, 138). The officers subsequently talked to the River Crest employees and the customers, obtained descriptions of the intruders, and gathered witness statements. (Tr. 7-17-02, 139-140, 146-149). CTPD Officer Mark Krutell ("Officer Krutell"), the K-9 officer, arrived at the River Crest that evening with his tracking dog, Cyrus, and tracked the scene. (Tr. 7-18-02, 91-93). Just outside the back door, Cyrus "alerted on two $20 bills that were on the blacktop part of the parking lot along with a small piece of rope." (Tr. 7-18-02, 94). Officer Krutell turned these items over to the CTPD evidence technician. (Tr. 7-18-02, 94). Several weeks later, on May 27, 2001, Mr. Barnett found a spent bullet lodged in a bank deposit book on his desk in his office. (Tr. 7-17-02, 57; Tr. 7-19-02, 72-73). Mr. Barnett turned the spent bullet over to the CTPD. (Tr. 7-17-02, 57; Tr. 7-19-02, 72-73).

Rachel Eschenburg ("Ms. Eschenburg") had known Christopher Schnorr ("Mr. Schnorr") since the eighth or ninth grade. (Tr. 7-18-02, 33-34). On April 10, 2001, Ms. Eschenburg, who was then pregnant, was living in Harper Woods with her boyfriend, John Henk ("Mr. Henk"), and their child. (Tr. 7-18-02, 34). Between 10:00 p.m. and 11:00 p.m., as she was preparing to go to bed, Ms. Eschenburg received calls on Mr. Henk's cellular telephone from Mr. Schnorr. (Tr. 7-17-02, 172-175; Tr. 7- 18-02, 36-39, 44). Mr. Schnorr asked Ms. Eschenburg to wake up Mr. Henk. (Tr. 7-18-02, 4 1-42). Ms. Eschenburg responded: "[W]hat's possibly so important, John has to get up early for work, why are you calling,. . . do you need a ride, are you hurt, what's the problem?" (Tr. 7-18-02, 42). Mr. Schnorr insisted that she wake up Mr. Henk, but Ms. Eschenburg refused. (Tr. 7-18-02, 42, 44).

Danielle Greene ("Ms. Greene") had met Mr. Schnorr in February of 2001 through a mutual friend. (Tr. 7-17-02, 154). Soon, Ms. Greene became Mr. Schnorr's girlfriend. (Tr. 7-17-02, 154-155). The relationship lasted for four or five months, ending in June of 2001. (Tr. 7-17-02, 155-156). Beginning in late March or early April of 2001, Mr. Schnorr moved into Ms. Greene's Detroit house. (Tr. 7-17-02, 156-157). On April 11, 2001, between 12:00 midnight and 1:00 a.m., Ms. Greene arrived home from Florida after a one-week vacation. (Tr. 7-17-02, 157). When Ms. Greene entered her house, Mr. Schnorr was there, along with his sister, Tammy Schnorr ("Ms. Schnorr"), and Mr. Schnorr's friend, Robert Keith ("Mr. Keith"). (Tr. 7-17-02, 158). Mr. Schnorr was upstairs. (Tr. 7-17-02, 158). Ms. Schnorr was Mr. Keith's girlfriend. (Tr. 7-18-02, 6). Ms. Greene went upstairs and observed Mr. Schnorr, who was wearing only boxer shorts. (Tr. 7-17-02, 162). Mr. Schnorr had "a burn on the lower part of his stomach and . . . a bigger wound on the inside of his

thigh, and then another little wound like down by his shin." (Tr. 7-17-02, 161-162). It appeared, to Ms. Greene, to be "a fresh injury." (Tr. 7-17-02, 164). The big wound on the inside of Mr. Schnorr's thigh looked "nasty." (Tr. 7-18-02, 28-29). The lower leg wound was "[p]usy and a little bloody," and looked like "an exit hole." (Tr. 7-17-02, 166). Ms. Greene watched Mr. Schnorr endeavor to treat the wounds. (Tr. 7-18-02, 5). Mr. Schnorr explained to Ms. Greene that "he had gotten shot in the leg" when he attempted to break up an altercation at a friend's house. (Tr. 7-17-02, 166-167). Ms. Greene did not believe this account, observing the "burn on the stomach" and believing that "something hot had been held against there." (Tr. 7-17-02, 167). Subsequently, Mr. Schnorr told Ms. Greene that he had "shot himself" while he was "fooling around with a friend's gun." (Tr. 7-17-02, 167-169). Later, Mr. Schnorr told Ms. Greene that he had provided a third explanation to the CTPD, telling them that "[h]e had hurt himself at work." (Tr. 7-18-02, 13).

Prior to Ms. Greene's trip to Florida, Mr. Schnorr had gone to Florida. (Tr. 7-17-02, 159). Ms. Greene rented a red Ford Mustang from Hertz Rent-A-Car ("Hertz") for Mr. Schnorr for his trip on March 29, 2001. (Tr. 7-17-02, 159-160). Mr. Schnorr had left for Florida on March 30, 2001, and was supposed to return the rental car on April 5, 2001. (Tr. 7-17-02, 161). Soon after she returned to Detroit on April 10, 2001, Ms. Greene learned that Mr. Schnorr had not yet returned the red Ford Mustang to Hertz. (Tr. 7-17-02, 169-170). On April 11, 2001, Ms. Greene and Mr. Schnorr returned the rental car. (Tr. 7-17-02, 170). Ms. Greene and Mr. Schnorr had to travel to an apartment complex's parking lot behind Chaplin's Comedy Club, which is located at 15 Mile Road and Groesbeck in Clinton Township. (Tr. 7-17-02, 171-172; Tr. 7-19-02, 84). The River Crest stands approximately 1 ½ to 2 miles away from this location. (Tr. 7-19-02, 84). Ms. Greene viewed blood on the left side of the driver's seat. (Tr. 7-17-02, 170-171; Tr. 7-19-02, 85).

That same morning, the CTPD assigned Detective James Hall ("Detective Hall") to investigate the robbery of the River Crest. (Tr. 7-19-02, 67). During the course of his investigation, Detective Hall began to focus on two suspects, Mr. Schnorr and Mr. Keith. (Tr. 7-19-02, 78). Dr. Werner Spitz ("Dr. Spitz"), a forensic pathologist, examined Mr. Schnorr on May 2, 2001, at the request of Detective Hall in order to determine whether his wounds were "consistent with being a gunshot wound." (Tr. 7-19-02, 34). Dr. Spitz observed "an elongated, approximately two inch long, vertical, maybe slightly oblique, healing wound on the front end of the thigh." (Tr. 7-19-02, 35). For Dr. Spitz, "the most likely thing this [injury] could have been was a gunshot wound." (Tr. 7-19-02, 35). Examining Mr. Schnorr, Dr. Spitz observed "another wound on the leg . . . above the inner aspect of the left knee." (Tr. 7-19-02, 35-36). For Dr. Spitz, it appeared to be "an exit wound." (Tr. 7-19-02, 36). Based on his examination, Dr. Spitz recommended that Detective Hall have Mr. Schnorr's leg x-rayed because he felt it likely that there was "metal in the wound." (Tr. 7-19-02, 36). On the whole, Dr. Spitz felt that a bullet entered Mr. Schnorr's inner thigh and "came out over the knee after it . . . depositing a piece of lead or a piece of metal in the . . . flesh." (Tr. 7-19- 02, 39-40). Further, Dr. Spitz felt that a discharged gun could have caused the burn that Mr. Schnorr had sustained on his

lower abdomen. (Tr. 7-19-02, 45-46).

      On May 3, 2001, Michael McHugh ("Mr. McHugh") was working as a physician's assistant at Corporate Occupational Health Services in Clinton Township. (Tr. 7-18-02, 48-50). On that day, the CTPD brought Mr. Schnorr, along with a search warrant, into the clinic with wounds to left leg and thigh. (Tr. 7-18-02, 50-52, 73). Mr. Schnorr told Mr. McHugh that he had "received an injury at work on April 10th" at about 10:00 p.m. (Tr. 7-18-02, 51-53). Mr. Schnorr's thigh wound "had healing wound edges, but there was a raw opened area." (Tr. 7-18-02, 53). Mr. McHugh cleansed and dressed the thigh wound. (Tr. 7-18-02, 53). According to Mr. McHugh, the healing progress of Mr. Schnorr's wounds correlated to the date that incurred these injuries. (Tr. 7-18-02, 56). Mr. McHugh took an x-ray of Mr. Schnorr's left thigh, which revealed "a metallic foreign body" in the muscle tissue of the inner thigh. (Tr. 7-18- 02, 56-58). Dr. Allen Russell ("Dr. Russell"), a radiologist at the clinic, reviewed the x-rays. (Tr. 7-18-02, 83-86). He saw "a piece of metal in the upper portion of [Mr. Schnorr's] leg just above the knee on the inside." (Tr. 7-18-02, 86-87). The metal object was 1.2 centimeters by 0.4 centimeters, or "[a]bout a half an inch by about . . . [a] sixth of an inch." (Tr. 7-18-02, 88-89). After reviewing the x-ray, Dr. Spitz agreed with Dr. Russell that it revealed "a piece of metal" and opined that "98 % of the bullet came out" through the exit wound above Mr. Schnorr's knee. (Tr. 7-19-02, 39-40).

      In late May of 2001, Detective Hall contacted Correctional Officer Donna Mileski ("Correctional Officer Mileski") of the Macomb County Sheriff's Department ("MCSD") and asked her to arrange for two corporeal lineups, one lineup that included Mr. Schnorr and one lineup that included Mr. Keith. (Tr. 7-19-02, 4-5, 78-79). The corporeal lineups occurred on May 30, 2001, at the Macomb County Jail ("MCJ"). (Tr. 7-19-02, 4, 10). Mr. Koutsimbas identified Mr. Schnorr as Intruder #1. (Tr. 7-17-02, 79-80; Tr. 7-19-02, 19, 80).

      On June 13, 2001, the prosecution charged Mr. Schnorr with Armed Robbery (MCL § 750.529), Conspiracy to Commit Armed Robbery (MCL § 750. 157a), and Felony Firearm (MCL § 750.227b). See Macomb County Circuit Court 01-2243-FC. At the preliminary examination, held on July 24, 2001, Mr. Koutsimbas identified Mr. Schnorr as Intruder #1. (Tr. 7-17-02, 80). On July 24, 2002, a jury convicted Mr. Schnorr as charged after a one-week trial before Macomb County Circuit Court Judge Deborah A. Servitto ("Judge Servitto"). (Tr. 7-24-02, 125-127). At the trial, Mr. Koutsimbas identified Mr. Schnorr as Intruder # 1, telling the jury that he was "positive" and had "no doubt in [his] mind." (Tr. 7- 17-02, 80-81).

Plaintiff-Appellee's Answer to Delayed Application for Leave to Appeal, in *People v. Schnorr*, No.

126361 (Mich.), at 1-9.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court]

precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Identification Claim (Claim I)*

Petitioner first contends that he was denied a fair trial by the introduction of Koutsimbas's line-up identification, which was the result of impermissibly suggestive procedures, and by the introduction of Koutsimbas's subsequent in-court identification. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Factual Background Relating to the Identification*

Prior to trial, petitioner moved to suppress both Koutsimbas's and Barnett's identifications of him as the armed robber. The trial court held a hearing on the matter, at which Koutsimbas testified that on the evening of the robbery, he was in the back of the restaurant with Barnett, his boss, when an individual came in through the back door. The man looked right at him, walked up to him, and told him to get on the ground. The man wore heavy clothing and a baseball hat, and was armed with a gun. The man pointed the gun at him and told him to "get down or I'm going to blow your head off." Koutsimbas got down on the ground. From there, he watched Barnett take the man to the cash register. *See* Wade Hr'g Tr., dated 4/9/02, at 9-13. When the police arrived, Koutsimbas told the officers that the man with the gun "was wearing baggy clothes, had a baseball cap" and light brown hair. He was a white male in his mid-20s. *See id*. at 14-16. On May 30, Koutsimbas appeared at a lineup at Detective Hall's request. Detective Hall simply asked him "if [he] could pick that guy out of the lineup," and he was not given any other instructions. Detective Hall told him to be truthful and only to identify someone if he was sure. Koutsimbas immediately identified petitioner, and testified that he had no doubt about his identification. *See id*. at 16-26. Koutsimbas testified that he got a clear look at petitioner from only inches away. *See id*. at 19-22, 25-26. He has 20/20 vision. *See id*. at 30-31. In a second lineup which included the person whom police

thought was the second individual, Koutsimbas tentatively identified another person, but was not sure of his identification because he did not really see the second person. Koutsimbas denied having talked to Barnett about the lineup procedure or the results of the lineup. *See id*. at 49-50.

At the conclusion of the hearing, the trial judge suppressed Barnett's identification. Although the materials filed in this Court do not include the portion of the transcript reflecting Barnett's testimony, it appears that at some point Detective Hall told Barnett that Koutsimbas had identified lineup participant #2 as the man with the gun, and that the police thought that this was the man who had committed the robbery. On this basis, the court suppressed Barnett's identification, and Barnett did not identify petitioner at trial. *See* Mot. Tr., dated 4/12/02, at 13. However, the court found that the lineup was not unduly suggestive as to Koutsimbas, and that he "is a wonderful witness and he, absolutely, is capable of identifying." *Id*. At trial, Koutsimbas was the only witness who identified petitioner as the perpetrator.

2.       *Clearly Established Law*

A pre-trial identification procedure violates the Constitution if "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). Similarly, a subsequent in-court identification following an impermissibly suggestive pre-trial identification is unconstitutional if the pr-trial "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). *See generally*, *Neil v. Biggers*, 409 U.S. 188, 197-98 (1972). A suggestive line-up alone, however, does nor require exclusion of identification evidence. "The admission of testimony concerning a suggestive and unnecessary identification procedure does

not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977). Thus, the central question in a case where the pre-trial identification procedure is impermissibly suggestive is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199; *accord Manson*, 432 U.S. at 114. The factors relevant to this "totality of the circumstances" analysis include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200; *accord Manson*, 432 U.S. at 114.

Thus, a court must "follow[] a two-step analysis in determining whether an identification is admissible." *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001). First, the court must "consider whether the identification procedure was suggestive." *Id*. If it was not, the "identification testimony is generally admissible without further inquiry," and any question as to the reliability of the identification "goes to the weight of the evidence, not its admissibility." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990). If, on the other hand, the procedure was suggestive, the court must "then determine whether, under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible." *Crozier*, 259 F.3d at 510.

3.    *Analysis*

Here, the Michigan Court of Appeals determined that there was no evidence that the lineup was impermissibly suggestive, and that the irregularities identified by petitioner went to the weight of Koutsimbas's identification testimony, not its admissibility. *See Schnorr*, 2004 WL 895881, at

*2-*3, slip op. at 2-3.  The Court should conclude that this determination was reasonable.

As noted above, the first question is whether the lineup identification procedure was unduly suggestive.  "If identification procedures prior to trial were not unduly suggestive, questions as to the reliability of a proposed in-court identification affect only the identification's weight, not its admissibility."  *United States v. Matthews*, 20 F.3d 538, 547 (2d Cir. 1994); *see also*, *Crozier*, 259 F.3d at 510.  This prong of the inquiry "questions whether the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection."  *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001).  Thus, a line-up is impermissibly suggestive where it "emphasizes the focus on a single individual thereby increasing the likelihood of misidentification."  *United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998) (internal quotation omitted); *see also*, *United States v. Wong*, 40 F.3d 1347, 1359-60 (2d Cir. 1994); *Griffin v. Rose*, 546 F. Supp. 932, 936 (E.D. Tenn. 1981), *aff'd*, 703 F.2d 561 (6th Cir. 1982).

Here, petitioner does not identify any factors which rendered the lineup procedures employed in his case impermissibly suggestive.  For example, he does not argue that the other participants varied greatly in their physical characteristics from him, or that he was the only participant who matched the descriptions given by witnesses to the police.  Rather, petitioner argues that Koutsimbas's identification was unreliable because he identified two separate individuals,[3] he did not have an opportunity to view the armed robber, and Koutsimbas's initial description of the robber

---

[3]As the court of appeals explained, this argument draws too much from the confusion evident at the evidentiary hearing regarding the two lineups.  It was clear that Koutsimbas identified petitioner in the first lineup.  He also tentatively identified a different individual in the second lineup, which involved petitioner's accomplice but not petitioner.  Although petitioner's counsel managed to confuse the matter at the evidentiary hearing, from the context it is clear that this second lineup was directed at attempting to identify the second robber, not the man with the gun.

varied from petitioner's physical characteristics. None of these facts, however, go to whether the lineup procedure itself was suggestive. They are, rather, attacks on the reliability of the identification which were raised by counsel on cross-examination at trial and for the jury to resolve. Further, the taint which infected Barnett's identification did not infect Koutsimbas's identification. First, Koutsimbas testified that he and Barnett did not discuss the lineup or Detective Hall's comments to Barnett, and the trial judge found Koutsimbas to be credible. And, in any event, even if Barnett did confirm to Koutsimbas that Koutsimbas had identified the man who the police thought was the robber, this confirmation came after the lineup had occurred and Koutsimbas had already identified petitioner. This after the fact confirmation, even if it occurred, could not have rendered the lineup impermissibly suggestive at the time it was conducted.

In short, petitioner's attacks on Koutsimbas's identification go to the reliability of that identification, not to the appropriateness of the lineup procedures employed. Petitioner offers nothing to show that the lineup procedures themselves were unduly suggestive, *i.e.*, that they created a very substantial likelihood of irreparable misidentification. "Short of that point, such evidence is for the jury to weigh." *Manson*, 432 U.S. at 116. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[4]

---

[4]In the court of appeals, petitioner also challenged the trial court's failure to give an instruction on the inherent unreliability of witness identification testimony pursuant to *People v. Anderson*, 389 Mich. 155, 205 N.W.2d 461 (1973). Petitioner does not appear to be raising this claim here. However, to the extent he does so, the claim is without merit. A comprehensive instruction on the dangers of misidentification was not required as a constitutional matter. *See Carey v. Maryland*, 617 F. Supp. 1143, 1148-49 (D. Md. 1985), *aff'd*, 795 F.2d 1007 (4th Cir. 1986); *Jones v. Smith*, 599 F. Supp. 1292, 1304 (S.D. Ala. 1984), *aff'd*, 772 F.2d 668 (11th Cir. 1985). And, in any event, petitioner has pointed to, and I have uncovered, no clearly established Supreme Court precedent, as required for relief to be warranted under § 2254(d)(1), which reasonably can be read as requiring such an instruction. *See Samu v. Elo*, 14 Fed. Appx. 477, 479 (6th Cir. 2001) (petitioner not entitled to habeas relief on basis of trial court's failure to give

E.    *Confrontation Claim (Claim II)*

Petitioner next contends that he was denied his right to confront the witnesses against him when the prosecution failed to call a *res gestae* witness who had been noticed on the prosecutor's witness list. The witness was John Brown, another cook from the restaurant who was present at the time of the robbery. The Court should conclude that petitioner is not entitled to habeas relief on this claim.[5]

1.    *Violation of Res Gestae Statute and Failure to Instruct*

To the extent that petitioner bases his claim on the prosecutor's violation of the Michigan *res gestae* statute and the trial court's failure to instruct the jury to draw an adverse inference from the prosecutor's failure to call the witness, petitioner's claim is not cognizable. It is well established that errors of state law do not provide a basis for habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Thus, petitioner's claim that the prosecutor violated state law regarding the production of res gestae witnesses is not cognizable on

_____

requested instruction where petitioner pointed to no clearly established federal law requiring the giving of such an instruction); *Hanna v. Farmon*, No. 98-56002, 1999 WL 402388, at *2 (9th Cir. June 10, 1999) (same); *Slaughter v. Parker*, 187 F. Supp. 2d 755, 809 (W.D. Ky. 2001) (same); *Rodriguez v. Zavaras*, 42 F. Supp. 2d 1059, 1107 (D. Colo. 1999) (same).

[5]Respondent argues that this claim is unexhausted, because it was not presented as a federal constitutional claim in the state courts. In his heading of the issue in his Michigan Court of Appeals brief, counsel for petitioner mentioned the Confrontation Clause, but did not make any confrontation argument in the body of the brief. In any event, the Court need not resolve the exhaustion matter because, as discussed below, the claim is without merit. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). In his reply brief, petitioner concedes the claim is unexhausted and asks that he be allowed to delete the claim rather than having the whole petition dismissed as a mixed petition. Because I do not recommend dismissing the whole petition on the grounds of exhaustion, I address the merits of the claim here.

habeas review.  *See Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 601 (E.D. Mich. 2001) (Tarnow, J.).[6]

Similarly, the court of appeals concluded as a matter of state law that petitioner was not entitled to

a missing witness instruction.  *See Schnorr*, 2004 WL 895881, at *4-*5, slip op. at 4-5.  Because he

was not entitled to such an instruction under state law, the failure of the trial court to give the

instruction did not deprive petitioner of a fair trial.  *See Thomas v. Lecureux*, 8 Fed. Appx. 461, 464-

65 (6th Cir. 2001).

2.      *Right to Confront the Witness*

Petitioner also contends that the prosecutor's failure to produce Brown as a witness violated

his right to confront the witnesses against him.  As an initial matter, petitioner's claim does not

implicate the Confrontation Clause.  The Sixth Amendment provides, in relevant part: "In all

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

against him [and] to have compulsory process for obtaining witnesses in his favor[.]" U.S. CONST.

amend. VI.  By its terms, the Confrontation Clause applies only to the witnesses at trial, and "a

defendant has no right to confront [a person] who provides no evidence at trial."  *United States v.

Francesco*, 725 F.2d 817, 822 (1st Cir. 1984); *accord Cooper v. California*, 386 U.S. 58, 62 n.2

(1967) ("Petitioner also presents the contention here that he was unconstitutionally deprived of the

right to confront the witnesses against him, because the State did not produce the informant to testify

against him.  This contention we consider absolutely devoid of merit.").    Thus, contrary to the

---

[6]Although there is no published Sixth Circuit decision directly on point, in a number of unpublished decisions the Sixth Circuit has reached this conclusion.  *See, e.g.*, *Smith v. Elo*, No. 98-1977, 1999 WL 1045877, at *1 (6th Cir. Nov. 8, 1999) (per curiam); *Moreno v. Withrow*, No. 94-1466, 1995 WL 428407, at *1 (6th Cir. July 19, 1995) (per curiam); *Lewis v. Jabe*, No. 88-1522, 1989 WL 145895, at *3 (6th Cir. Dec. 4, 1989) (per curiam); *Atkins v. Foltz*, No. 87-1341, 1988 WL 87710, at *2 (6th Cir. Aug. 24, 1988) (per curiam).

implication of petitioner's argument, under the Sixth Amendment "[a] defendant has no right to confront a 'witness' who provides no evidence at trial. Nor is the government required to call all of the witnesses to a crime." *United States v. Heck*, 499 F.2d 778, 789 n.9 (9th Cir. 1974) (citations omitted) (internal quotation omitted). Because Brown did not give any testimony against petitioner at trial, the failure to produce Brown does not implicate the Confrontation Clause.

Rather, to the extent the failure of Brown to testify implicates the Sixth Amendment, it does so under the Compulsory Process Clause, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor[.]" U.S. CONST. amend. VI. The Compulsory Process Clause, as a general matter, "grants a criminal defendant the right to call witnesses that are 'material and favorable to his defense.'" *Wong v. Money*, 142 F.3d 313, 324 (6th Cir. 1998) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Unfortunately, the Supreme Court has provided little guidance on the exact contours of the Compulsory Process Clause. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 55 & n. 12 (1987) (noting that the Compulsory Process Clause has rarely been a factor in the Court's decisions). Nevertheless, some general principles do exist to guide the Court's determination. First, as a general matter the clause establishes, "at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Id.* at 56. Second, it is clear that the right to compulsory process is not absolute; thus, in certain circumstances a witness may be precluded from testifying as a sanction for defendant's failing to comply with a discovery order, *see Taylor v. Illinois*, 484 U.S. 400, 410-14 (1988), and testimony is subject to general evidentiary rules such as those governing relevance and privilege, *see Washington v. Texas*, 388

U.S. 14, 23 n.21 (1967); *Smith v. Cromer*, 159 F.3d 875, 882 (4th Cir. 1998).

To the extent that petitioner claims he was entitled to question Brown as a matter of the Compulsory Process Clause, the claim fails. First, petitioner was not denied the court's assistance in locating these witnesses and assuring their appearance at trial. Rather, as detailed by the Michigan Court of Appeals, the police made significant efforts to locate Brown and produce him for trial:

> On the eve of the last day of trial, when the prosecutor admitted to failing to find the witness, the trial court took testimony from a police officer to ascertain whether proper efforts had been taken. The officer described telephoning Brown only to discover that the line was not in service. The officer additionally detailed checking Brown's address with the Secretary of State's office, and sending two detectives to the address who indicated that no one answered the door and there were no cars parked about the premises. A subpoena was prepared and mailed for this witness a month earlier, but there was no response. The police witness interjected that the owner of the restaurant had indicated that Brown left his employment in bad terms, and that there had been no further contact between the two. The trial court issued a warrant for Brown in hopes that he might appear the next day.
>
> At the beginning of the next day's proceedings, the police witness returned and stated that additional efforts again failed to produce Brown. These efforts included searching the Internet for a current address and phone number, trying the latter number twice, checking the last known address again repeatedly and leaving a business card there, and trying to find a neighbor to question about Brown's whereabouts. The trial court concluded that this evidence indicated "a sufficient exercise of due diligence," and thus that no special jury instruction would be given.

*Schnorr*, 2004 WL 895881, at *4, slip op. at 5. The Compulsory Process Clause does not guarantee the appearance of any witness; it only requires that the government "exercise due diligence in a good faith effort to secure the attendance of subpoenaed witnesses." *United States v. Baker*, 553 F.2d 1013, 1022 (6th Cir. 1977). The court of appeals reasonably concluded, based on the testimony presented, that such a good faith effort was made in petitioner's case.

Second, as the Supreme Court has explained, "more than mere absence of testimony is necessary to establish a violation of the right [to compulsory process]." *United States v. Valenzuela-*

*Bernal*, 458 U.S. 858, 866 (1982). The Sixth Amendment does not provide a defendant the right to process for obtaining any witness, only "witnesses in his favor." U.S. CONST. amend. VI. "This language suggests that [a defendant] cannot establish a violation of his constitutional right to compulsory process merely by showing that [he was deprived of witnesses' testimony]. He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *Valenzuela-Bernal*, 458 U.S. at 867. Petitioner has made no showing that Brown could have offered any favorable, material, and noncumulative evidence in support of his defense. *See Valenzuela-Bernal*, 458 U.S. at 873 (defendant must show that the evidence "would have been material and favorable in ways not merely cumulative to the testimony of available witnesses."). Petitioner contends that Brown's testimony would have contradicted Koutsambis's testimony, but this is not so. He notes that Brown was unable to identify him at the line-up, but so did every other witness, a fact which was well known to the jury, and which in any event does not implicate what Koutsambis saw. The fact that another witness could not identify petitioner, in addition to all of the other witnesses who could not identify him, would have done little if any thing to sway the jury. Further, the fact that Brown failed to identify petitioner was presented to the jury through the testimony of Officer Donna Mileski. *See* Trial Tr., Vol. II, at 21-22. There is no allegation from petitioner suggesting that Brown could have provided any other material, favorable information, and nothing in the record supports such a conclusion. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Evidentiary Claim (Claim III)*

Finally, petitioner contends that he was denied a fair trial by the introduction of evidence of a self-inflicted gunshot wound. The Court should conclude that petitioner is not entitled to habeas

relief on this claim.

1.    *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude.  *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.  State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution."  *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).  As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."  *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy."  *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Where a specific constitutional right–such as the right

to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

2.      *Analysis*

As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence. This being the case, petitioner is not entitled to habeas relief even if the evidence was not properly admitted under Rule 404(b). Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974).

Here, the evidence was relevant because it tended to support the prosecution's argument that petitioner was the robber. The witnesses testified that while petitioner was in the office gathering money the gun discharged. Further, there was evidence to show that the wound on petitioner's leg had come from a gun shot, and that the wound was inflicted on the evening of the robbery. While none of this evidence, either individually or collectively, would definitively establish that petitioner was the robber, the evidence is certainly relevant evidence of that fact. *See* MICH. R. EVID. 401 (emphasis added) (defining relevant evidence as "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence."); JOHN W. STRONG, MCCORMICK ON EVIDENCE § 185 (5th ed. 1999) ("An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. . . . It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. . . . A brick is not a wall."). Because the evidence was relevant, petitioner cannot show that he was denied a fair trial by the introduction of the evidence. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR

72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


<u>s/Paul J. Komives</u>
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 3/24/08